

U.S. District Court
Wisconsin Eastern
JUL 1 0 2026
Clerk of Court

# SECTION: I — CAPTION

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF WISCONSIN

**DELLA C. BOND**, Plaintiff,

v.

**DENIS MCDONOUGH**, Secretary, U.S. Department of Veterans Affairs, Defendant.

Case No.: _____ 2 6 -C- 1 2 1 7

## SECTION: II — INTRODUCTION

Plaintiff Della C. Bond brings this action to expose a documented pattern of escalating harassment, retaliation, physical intimidation, and systemic supervisory failure carried out by the Department of Veterans Affairs. Defendant's agents did not merely fail to protect Plaintiff — they actively preserved a hostile environment through false denials, evidence suppression, investigative obstruction, and refusal to follow mandatory EEO procedures.

Plaintiff is a 70% service-connected disabled U.S. Navy Veteran who, at the time of the events, was under approved FMLA, experiencing panic attacks, and undergoing formal evaluation by VA clinicians for service-connected disability. Plaintiff's VA therapist documented panic attacks, stomach issues, and significant weight loss directly linked to workplace stress. Plaintiff was later found 70% disabled in October 2025 — immediately after leaving federal employment — confirming the severity of her medical deterioration.

Defendant had direct written knowledge of Plaintiff's medical vulnerability. On June 16, 2025, Branch Chief Matthew Zawada acknowledged: "You have mentioned some health issues lately…" Despite this awareness, management repeatedly subjected Plaintiff to escalating hostility. During the EEO process, the Agency's investigator attempted to block Plaintiff's medical documentation entirely, verbally stating over the phone that Plaintiff "did not need to include" her medical evidence — despite its direct relevance to disability-based harassment, FMLA status, and constructive discharge.

**Manufactured Incident #1 — Kitchen Hoods & Ductwork Cleaning Services**

Retaliation began with Manufactured Incident #1. After Plaintiff raised legitimate concerns about a potential protest, CO Eileen Meyer and Branch Chief Matthew Zawada jointly reviewed the Statement of Work and determined the SOW was flawed. They issued a controlling directive: Plaintiff was to cancel the solicitation, return the requirement to the customer, have the SOW corrected, re-solicit, and award — all of which Plaintiff successfully completed.

Case 2:26-cv-01217-JPS    Filed 07/10/26    Page 1 of 19    Document 1

Immediately after leaving the meeting where the CO and Branch Chief issued this controlling directive, Meyer conducted unauthorized fact-finding, misinterpreted an outdated draft, and confronted Plaintiff unprofessionally. Instead of correcting Meyer's misconduct, Zawada launched retaliatory fact-finding meetings.

**Management Failure #1 — Ivy Ignores, Lauro Denies Accommodation**

Plaintiff escalated to Deputy Director of Contracting Scott Ivy, who offered no assistance. Plaintiff then escalated to Director of Contracting Paul Lauro, requesting a transfer to the VA Cybersecurity Division as a reasonable accommodation. Lauro denied the request — the first denial of a safety-based accommodation.

**Manufactured Incident #2 — Feminine Hygiene Procurement**

Retaliation escalated into Manufactured Incident #2. On August 14, 2025, Zawada issued contradictory directives regarding emergency NTP actions. Plaintiff had already explained that the delay was caused by missing West Campus funding — confirmed by Branch Chief and former attorney Erika Cannaday.

When Plaintiff attempted to clarify the directive, Zawada stormed out of his office, marched to Plaintiff's desk, physically blocked her in, and yelled aggressively. Plaintiff documented: "you stood over top of me… as if you were about to square off and punch me in the face!" Witnesses Laura Brouach and Michelle Klug ran to Plaintiff's desk because they "could not believe" his conduct.

**Management Failure #2 — Lauro Denies Safety and Assigns a "Buffer" Who Later Denies Knowledge**

Because Ivy had already failed her, Plaintiff escalated directly to Director of Contracting Paul Lauro. Plaintiff reported physical bullying and requested — for the second time — to be removed from Branch Chief Matthew Zawada's team. Lauro denied the request again. Instead of removing Plaintiff from danger, Lauro instructed Zawada to have "no physical contact" with Plaintiff and directed her to report to Branch Chief and former attorney Erika Cannaday if she needed to meet with Zawada. Despite being assigned as Plaintiff's safety buffer, Cannaday later denied any knowledge of the second deskside incident.

**Manufactured Incident #3 — Siemens Syngo Dynamic Option Year**

Retaliation culminated in Manufactured Incident #3. On August 28, 2025, Zawada falsely accused Plaintiff of delaying the Siemens Syngo OY2 modification. Plaintiff followed FAR 52.217-9, the Option Year Checklist, and the timeline tool precisely: "According to the timeline tool: I had until 8/26/2025; the MOD was sent on 8/25/2025." The CO awarded the modification on August 26, 2025.

Plaintiff presented Zawada with all evidence proving she handled the requirement correctly. Zawada never responded. He never acknowledged the evidence, never corrected himself, never apologized, and never addressed the false accusation. His silence was retaliatory and intentional.

**Constructive Discharge**

At this moment, Plaintiff realized that no supervisor — Ivy, Picchi, Cannaday, or Lauro — would intervene or protect her. After three manufactured incidents, two deskside confrontations, repeated supervisory failures,

denial of safety accommodations, escalating retaliation, and worsening medical harm documented by VA clinicians, Plaintiff was forced to resign on September 10, 2025 — a clear constructive discharge.

## SECTION: III — JURISDICTION AND VENUE

This Court has jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f). Plaintiff exhausted all required administrative remedies, including EEO counseling, formal complaint filing, participation in the investigation, and receipt of the Final Agency Decision.

Venue is proper in the Eastern District of Wisconsin because the unlawful employment practices occurred in Milwaukee, Wisconsin, where Plaintiff worked at Network Contracting Office 12 ("NCO12").

## SECTION: IV — PARTIES

**Plaintiff:** Della C. Bond, former GS-1102 Contract Specialist, NCO12, Milwaukee, Wisconsin.

**Defendant:** Denis McDonough, Secretary of the U.S. Department of Veterans Affairs, sued in his official capacity.

## SECTION: V — FACTUAL ALLEGATIONS

### A. First Deskside Incident — June 11, 2025 (Exhibit E)

CO **Eileen Meyer** stood over Plaintiff, yelled loudly, humiliated her publicly, and threatened to take her to Branch Chief **Matthew Zawada's** office "to have a talk," implying immediate termination. Plaintiff suffered a panic attack. Witness: **Dustin Biermann.**

Meyer responded to Plaintiff's email with a dismissive "thumbs up" emoji, later removed from the email chain.

### B. Retaliatory Fact-Finding — June 24, 2025 (Exhibit E)

Instead of addressing Meyer's misconduct, **Zawada** launched a "Fact Finding Meeting" against Plaintiff.

He yelled, pressured Plaintiff to admit statements she could not recall, and displayed hostility. Union President **Michele Malone** intervened. Branch Chief **Erika Cannaday** transcribed the meeting.

Zawada later omitted key information from the transcript.

### C. Feminine Hygiene Contract Harassment — July–August 2025 (Exhibit L)

Funding delays were confirmed by **Cannaday** and FHCC fiscal staff. Plaintiff could not proceed until fiscal corrected the 2237.

Despite documented funding delays, **Zawada** repeatedly accused Plaintiff of "severe delays," demanded immediate responses, and issued contradictory instructions.

This harassment directly triggered the second deskside incident.

### D. Second Deskside Incident — August 14, 2025 (Exhibits L & M)

At approximately 2:00 p.m., **Zawada** approached Plaintiff's desk, leaned into her personal space, placed both hands on her cubicle entrance, and yelled aggressively. Plaintiff feared physical harm.

Witness **Laura Brouach** wrote:

"I witnessed Matt leaning into Della's space... talking very loudly and aggressively... Della was shaken up and tearful."

Witness **Michelle Klug** also ran to Plaintiff's desk.

Plaintiff reported the incident to **Director of Contracting Paul Lauro**, who acknowledged receipt but took no protective action.

### E. Management Denial — Branch Chief David Picchi (Exhibits L & M)

Because **Cannaday** was unavailable, **Branch Chief David Picchi** conducted the initial interview regarding the second deskside incident.

Plaintiff provided him with contemporaneous details of:

- Zawada's threatening posture
- aggressive tone
- physical intimidation
- witness identities

Despite this, **Picchi later denied knowledge of the incident during the EEO process.**

His denial is contradicted by:

- Plaintiff's contemporaneous email
- his own interview
- Broach's eyewitness statement

This reflects a broader pattern of false denials within Plaintiff's chain of command.

### F. Document Tampering — Removal of "Thumbs Up" Emoji (Exhibit E)

Meyer's dismissive emoji disappeared from email chains after the June 24 meetings. Plaintiff preserved screenshots. Meyer was on leave, raising concerns about how she knew to remove it.

### G. Last Incident of Harassment — August 28, 2025 (Exhibit T)

Plaintiff sent a detailed, policy-based clarification email regarding the Siemens Syngo OY2 renewal.

Meyer responded with hostility:

"Your response insinuates I had the OY to review for 8 months and did nothing with it?"

Zawada falsely accused Plaintiff of delaying the requirement for eight months, contradicting documented timelines.

## H. Constructive Discharge — September 10, 2025

After repeated harassment, retaliation, intimidation, document tampering, false denials, and denial of protection, Plaintiff resigned.

Plaintiff later became medically rated **70% disabled** and was unable to maintain subsequent employment due to trauma caused by Defendant's conduct.

## SECTION: VI - PROCEDURAL FAILURES

The Agency committed multiple procedural failures that independently demonstrate reprisal, hostile work environment, and systemic breakdown of required protections. These failures occurred across Plaintiff's entire chain of command and are supported by contemporaneous documentation, witness statements, and multiple exhibits.

### Failure to Protect Plaintiff After Reporting Harassment (Exhibits L, M, E)

Plaintiff repeatedly notified management of harassment, intimidation, and physical threats. Despite receiving contemporaneous documentation, the Agency failed to take any protective action.

- On **June 11, 2025,** Plaintiff reported the first deskside incident involving CO Eileen Meyer. No investigation or corrective action occurred.

- On **June 24, 2025,** Plaintiff reported retaliatory conduct by Branch Chief Matthew Zawada. No protective measures were implemented.

- On **August 14, 2025,** Plaintiff reported the second deskside incident directly to **Director of Contracting Paul Lauro** (Exhibit L). Lauro acknowledged receipt but took no action to protect Plaintiff.

- Witness **Laura Brouach** (Exhibit M) corroborated the physical intimidation, yet the Agency still failed to intervene.

This constitutes a clear failure to protect an employee from escalating harassment and physical threat.

### Failure to Investigate Physical Threats (Exhibits L & M)

The second deskside incident involved:

- Zawada leaning into Plaintiff's cubicle,

- placing both hands on either side of her cubicle entrance,

- yelling aggressively,

- and appearing ready to strike her.

Witnesses **Laura Brouach** and **Michelle Klug** ran to Plaintiff's desk to check on her safety.

Despite this:

- No investigation occurred.

- No statements were collected from witnesses.

- No disciplinary action was taken.

- Plaintiff remained under Zawada's supervision.

This violates basic workplace safety obligations and constitutes procedural failure.

**Failure to Preserve Accurate Testimony — False Denial by Branch Chief David Picchi (Exhibits L & M)**

Because Branch Chief **Erika Cannaday** was unavailable on August 14, 2025, **Branch Chief David Picchi conducted the initial interview** regarding the second deskside incident.

Plaintiff provided him with contemporaneous details of:

- Zawada's threatening posture,

- aggressive tone,

- physical intimidation,

- and the witnesses who observed the incident.

Despite personally receiving Plaintiff's report and documenting her account, **Picchi later denied knowledge of the incident during the EEO process.**

His denial is contradicted by:

- Plaintiff's contemporaneous email to him,

- his own initial interview, and

- the eyewitness statement of **Contract Specialist Laura Brouach**, who wrote: *"I witnessed Matt leaning into Della's space... talking very loudly and aggressively... Della was shaken up and tearful."*

Picchi's denial demonstrates:

- failure to preserve evidence,

- false statements during the EEO process,

- alignment with a retaliatory narrative, and

- systemic breakdown of required investigative integrity.

## Failure to Preserve Required Evidence — Attempt to Exclude Second Deskside Incident (Exhibits L & ORM Emails)

The Agency initially attempted to keep the second deskside incident **out of the investigative record**, despite Plaintiff reporting it immediately on August 14, 2025 and despite contemporaneous documentation and eyewitness statements.

On February 27, 2026, Plaintiff emailed ORM Case Manager **Curtis Smith** and COR-Investigator **Rena Wollmann** requesting that the second deskside incident be formally added to the case file. The investigator initially refused, incorrectly claiming it was a "new claim" and therefore outside the accepted scope.

Plaintiff clarified that the second deskside incident was part of the original accepted hostile work environment claim and provided contemporaneous documentation showing it was already included in the accepted basis. Plaintiff also provided the original acceptance correspondence from her EEO intake representative confirming the incident was part of the accepted claim.

After Plaintiff escalated the issue, ORM reversed course. In an email dated February 27, 2026, Investigator **Rena Wollmann** wrote:

"We will be adding that event as additional information to your current events accepted."

This confirms that the Agency initially attempted to exclude the incident and only added it after Plaintiff escalated the matter and provided proof.

This failure to preserve required evidence demonstrates:

- improper narrowing of the investigative record,
- attempted exclusion of critical hostile-work-environment evidence,
- mischaracterization of Plaintiff's claims,
- procedural misconduct, and
- retaliatory obstruction of the investigative process.

## Failure to Interview Required Witnesses and Attempted Exclusion of Critical Evidence (Exhibits & ORM Emails)

The Agency failed to interview multiple required witnesses who possessed direct, firsthand knowledge of the events relevant to Plaintiff's accepted claims. Plaintiff formally requested that these individuals be added to the investigative record on **May 5, 2026**, immediately following mediation. The request included:

- **Paul Lauro** – Director of Contracting, informed of Deskside Incident #2
- **Scott Ivy** – Deputy Director, informed of Deskside Incident #2
- **Matthew Zawada** – Branch Chief, perpetrator of multiple incidents

Page **7** of **24**

- **Erika Cannaday** – Branch Chief, witness to aggressive conduct during fact-finding

- **David Picchi** – Branch Chief, conducted interview regarding Deskside Incident #2

- **Eileen Meyer** – Contracting Officer, perpetrator of Deskside Incident #1

- **Dustin Biermann** – Eyewitness to Deskside Incident #1

- **Laura Brouach** – Eyewitness to Deskside Incident #2

- **Michelle Kluge** – Eyewitness to Deskside Incident #2

- **Michael Malone** – Union President, intervened during fact-finding

These individuals were essential to establishing the full factual record.

On **May 6, 2026**, ORM Case Manager **Curtis Smith** confirmed he escalated Plaintiff's witness-addition request to the **Investigations Contracting Team (OICT)**. However, COR-Investigator **Rena Wollmann** responded that the investigation had already been "completed" and was being "reviewed and released," despite Plaintiff's request being submitted **before** the ROI was finalized.

Plaintiff escalated the issue again on **May 8, 2026**, informing Supervisory EEO Investigator **Julie Coyne** that the ROI omitted all required witnesses. Coyne acknowledged receipt and confirmed that Plaintiff's concerns "will remain part of the investigative file," but stated the ROI could not be reopened to include the witnesses.

This sequence demonstrates:

- the Agency prematurely finalized the ROI,

- knowingly excluded required witnesses,

- ignored Plaintiff's timely request,

- failed to interview eyewitnesses to physical intimidation,

- failed to interview management officials with direct knowledge,

- and failed to interview individuals whose statements contradicted management's narrative.

Additionally, the Agency initially attempted to exclude the **second deskside incident** from the investigative record. On **February 27, 2026**, Investigator **Charles Icaro** incorrectly claimed the incident was a "new claim" and refused to add it. Plaintiff escalated the issue to ORM leadership, providing contemporaneous documentation proving the incident was part of the original accepted hostile-work-environment claim.

After escalation, COR-Investigator **Rena Wollmann** reversed course, writing:

"We will be adding that event as additional information to your current events accepted."

This confirms the Agency attempted to exclude critical evidence and only corrected the record after Plaintiff intervened.

These failures constitute significant procedural misconduct and undermine the integrity of the investigative process.

**Failure to Preserve Evidence — Removal of "Thumbs Up" Emoji (Exhibit E)**

Plaintiff documented that CO Eileen Meyer's dismissive "thumbs up" emoji — originally visible in all email chains — disappeared after the June 24 meetings.

Plaintiff preserved screenshots showing:

- the emoji was present before the meetings,
- the emoji was present when forwarded to Zawada,
- the emoji disappeared afterward.

Meyer was on leave from June 19 to July 8, raising concerns about:

- how she knew to remove the emoji,
- why she removed it, and
- whether she was instructed to do so.

This constitutes:

- evidence tampering,
- failure to preserve records, and
- procedural misconduct.

**Failure to Correct False Narratives (Exhibits E, L, M, T)**

Multiple members of Plaintiff's chain of command aligned with false narratives contradicted by contemporaneous documentation:

- Cannaday aligned with Zawada's narrative despite funding emails proving Plaintiff's accuracy.
- Picchi denied knowledge of the second deskside incident despite conducting the initial interview.
- Zawada repeatedly misrepresented timelines and accused Plaintiff of delays contradicted by fiscal documentation.
- Meyer mischaracterized Plaintiff's work and responded with hostility despite Plaintiff's documented compliance.

This pattern demonstrates systemic procedural failure.

**Failure to Prevent Continued Harassment (Exhibits L, M, T)**

The Agency allowed harassment to escalate through:

- the first deskside incident,
- retaliatory fact-finding,
- the second deskside incident,
- document tampering,
- false denials,
- and the final incident of harassment on August 28, 2025 (Exhibit T).

Despite multiple reports, witness statements, and documentation, the Agency took no corrective action.

**Failure to Provide Reasonable Accommodation (Exhibit E)**

Plaintiff, a **70% service-connected disabled U.S. Navy Veteran**, requested a reasonable accommodation:

- transfer to the VA Cybersecurity Department
- or any safe alternative assignment

Director **Paul Lauro** denied the request, stating it was "not in the best interest of the VA," despite having full authority to approve it.

This denial contributed directly to Plaintiff's constructive discharge.

**Failure to Follow EEO Procedures**

The Agency failed to:

- notify Plaintiff of ADR rights,
- properly accept and track claims,
- maintain accurate records,
- preserve evidence,
- prevent retaliation,
- and comply with required timelines.

## Failure to Initiate Required Formal-Stage ADR Mediation (Exhibit X)

The Agency failed to initiate required ADR mediation during the formal EEO stage, despite Plaintiff's timely request and ongoing case activity. On March 20, 2026, ADR Regional Manager Leroy Hill (Washington, D.C.) admitted that Plaintiff's formal-stage mediation was never opened due to procedural oversight. Hill confirmed that Plaintiff's informal ADR sessions had been closed in September 2025, but no new ADR request was initiated once Plaintiff's complaint advanced to the formal EEO stage. As a result, Plaintiff received no mediation correspondence and was deprived of required ADR access. Only after Plaintiff followed up did

Washington headquarters create a new ADR request and assign a mediator. This failure demonstrates procedural misconduct, improper case handling, and obstruction of Plaintiff's rights under the EEO process.

These failures independently support Plaintiff's claims of reprisal and hostile work environment.

## SECTION VII — CLAIMS FOR RELIEF

Plaintiff is a **70% service-connected disabled U.S. Navy Veteran**, a protected class under Title VII (retaliation), the Rehabilitation Act (disability discrimination), and federal anti-reprisal statutes. Plaintiff's protected status heightened the Agency's duty to prevent harassment, retaliation, and hostile work conditions.

Plaintiff asserts the following claims:

### Hostile Work Environment

Defendant subjected Plaintiff to severe and pervasive harassment, intimidation, verbal abuse, physical intimidation, document tampering, and retaliatory conduct that altered the conditions of her employment.

### Protected FMLA Status

Plaintiff was under approved FMLA throughout the events described in this complaint, and Defendant had documented knowledge of her medical condition, panic attacks, and ongoing VA disability evaluation. Defendant's actions therefore occurred while Plaintiff was actively protected under federal FMLA law.

### Retaliation

Defendant retaliated against Plaintiff for engaging in protected EEO activity, including reporting harassment, requesting union representation, requesting reasonable accommodation, and documenting misconduct.

### Constructive Discharge

Defendant created intolerable working conditions that forced Plaintiff to resign on September 10, 2025. Plaintiff's resignation was a direct result of repeated harassment, retaliation, intimidation, and denial of protection.

### Disability-Based Harassment / Failure to Accommodate

As a 70% disabled veteran, Plaintiff requested a reasonable accommodation (transfer to Cybersecurity & a second request to transfer out of Branch Chief Matthew Zawada's team). The Agency denied the request despite full authority to grant it, contributing to Plaintiff's constructive discharge.

## SECTION VIII — DAMAGES

Plaintiff suffered significant damages as a direct and proximate result of Defendant's unlawful harassment, retaliation, hostile work environment, and constructive discharge. These damages include economic losses, medical aggravation, emotional distress, reputational harm, and long-term impairment of earning capacity.

## A. Economic Damages

### 1. Lost Wages — Federal Employment

Plaintiff was forced to resign on September 10, 2025 due to intolerable working conditions. As a GS-1102 Contract Specialist, Plaintiff lost:

- regular salary and locality pay,
- annual step increases,
- federal retirement contributions (FERS),
- Thrift Savings Plan (TSP) matching contributions,
- federal health insurance benefits,
- federal job security and promotional opportunities.

### 2. Lost Wages — Post-Resignation Employment

After resigning, Plaintiff obtained employment with the State of Nevada. However, due to severe anxiety, panic attacks, and trauma caused by Defendant's conduct, Plaintiff was unable to maintain the position.

This resulted in:

- loss of Nevada state wages,
- loss of Nevada retirement contributions,
- loss of Nevada health benefits,
- interruption of Plaintiff's employment history,
- additional financial instability.

### 3. Future Lost Earnings / Impaired Earning Capacity

Plaintiff's earning capacity has been permanently diminished due to:

- medical deterioration,
- psychological trauma,
- inability to sustain employment,
- VA-rated disability of 70%,
- long-term anxiety and panic disorder triggered by workplace trauma.

Plaintiff's future earning capacity is significantly impaired compared to her federal career trajectory.

Case 2:26-cv-01217-JPS     Filed 07/10/26     Page 12 of 19     Document 1

**B. Medical Damages**

**1. Aggravation of Pre-Existing Conditions**

Plaintiff is a **70% service-connected disabled U.S. Navy Veteran.** Defendant had documented knowledge of Plaintiff's medical vulnerabilities, including panic attacks and stress-related symptoms.

Defendant's conduct aggravated Plaintiff's conditions, causing:

- increased panic attacks,
- severe anxiety,
- emotional destabilization,
- physical deterioration,
- long-term psychological trauma.

**2. New or Worsened Medical Conditions**

The hostile work environment and physical intimidation caused:

- chronic stress response,
- sleep disruption,
- hypervigilance,
- fear of physical harm,
- trauma-related symptoms consistent with workplace bullying.

**3. Medical Treatment Costs**

Plaintiff incurred and continues to incur costs for:

- therapy and counseling,
- medical appointments,
- medication,
- VA treatment related to aggravated conditions.

**C. Emotional Distress Damages**

Plaintiff endured severe emotional distress due to:

- public humiliation,
- physical intimidation,

- retaliatory investigations,
- false accusations,
- document tampering,
- denial of protection,
- fear for personal safety,
- loss of professional reputation,
- loss of trust in management,
- anxiety about retaliation,
- panic attacks at work and at home.

The emotional distress was severe, pervasive, and long-lasting.

## D. Reputational Harm

Defendant's actions damaged Plaintiff's professional reputation by:

- falsely accusing Plaintiff of delays,
- misrepresenting her performance,
- undermining her credibility,
- creating false narratives,
- denying knowledge of documented incidents,
- circulating inaccurate statements within management.

This reputational harm affected Plaintiff's ability to secure and maintain future employment.

## E. Loss of Career Advancement

Plaintiff lost:

- promotional opportunities within NCO12,
- advancement within the GS-1102 career ladder,
- eligibility for GS-12/13 positions,
- federal procurement specialization credentials,
- long-term career stability.

**F. Loss of Federal Benefits**

Plaintiff lost:

- FERS retirement contributions,
- TSP matching contributions,
- federal health insurance,
- federal life insurance,
- federal job protections,
- federal leave accrual,
- federal service credit toward retirement.

**G. Compensatory Damages**

Plaintiff seeks compensatory damages for:

- emotional pain,
- suffering,
- mental anguish,
- loss of enjoyment of life,
- humiliation,
- inconvenience,
- medical aggravation,
- psychological trauma.

**H. Punitive-Equivalent Relief (Where Permitted)**

Although punitive damages are not available against federal agencies under Title VII, Plaintiff seeks all **punitive-equivalent remedies** permitted under federal law, including:

- enhanced compensatory damages,
- full back pay,
- full front pay,
- restoration of lost benefits,
- equitable relief,

Case 2:26-cv-01217-JPS    Filed 07/10/26    Page 15 of 19    Document 1

- injunctive relief.

## I. Additional Damages Under the Rehabilitation Act

Under the Rehabilitation Act, Plaintiff seeks damages for:

- failure to accommodate,

- disability-based harassment,

- constructive discharge caused by disability-related retaliation,

- worsening of service-connected conditions.

## SECTION IX — PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and award all relief available under federal law, including but not limited to the following:

## A. Declaratory Relief

1. A declaration that Defendant subjected Plaintiff to a hostile work environment in violation of Title VII and the Rehabilitation Act.

2. A declaration that Defendant engaged in retaliation for Plaintiff's protected EEO activity.

3. A declaration that Defendant's conduct constituted constructive discharge.

4. A declaration that Defendant failed to provide reasonable accommodation to Plaintiff, a 70% service-connected disabled veteran.

5. A declaration that Defendant's agents engaged in procedural misconduct, including false denials, document tampering, and failure to investigate.

## B. Economic Relief

1. Back pay from the date of constructive discharge through judgment.

2. Front pay for future lost earnings due to impaired earning capacity.

3. Restoration of lost federal benefits, including retirement contributions, TSP matching, and federal service credit.

4. Compensation for lost Nevada state employment, including wages, retirement contributions, and benefits.

## C. Compensatory Damages

Plaintiff seeks full compensatory damages permitted under Title VII and the Rehabilitation Act, including:

- emotional pain and suffering,

- mental anguish,

- humiliation,

- loss of enjoyment of life,

- reputational harm,

- psychological trauma,

- medical aggravation of service-connected disabilities,

- therapy, counseling, and treatment costs.

## D. Disability-Related Damages (Rehabilitation Act)

1. Damages for failure to accommodate Plaintiff's disability.

2. Damages for disability-based harassment.

3. Damages for constructive discharge caused by disability-related retaliation.

4. Damages for worsening of Plaintiff's service-connected conditions.

## E. Equitable and Injunctive Relief

Plaintiff requests equitable relief including:

1. **A corrected, clean SF-50** reflecting accurate separation information and removing any improper or retaliatory coding.

2. **Removal of all negative, inaccurate, or retaliatory remarks** from Plaintiff's personnel file, including but not limited to:

   o performance records,

   o conduct records,

   o internal notes,

   o supervisory comments,

   o any documentation created or influenced by retaliatory actors.

3. **Two neutral references** from the Department of Veterans Affairs confirming Plaintiff's service without negative commentary.

4. **A letter declaring Plaintiff eligible for federal employment,** restoring her ability to apply for federal positions without prejudice.

5. **A letter declaring Plaintiff eligible for employment within the Department of Veterans Affairs,** confirming that Plaintiff is not barred or restricted from VA employment.

6. Correction of inaccurate records related to Plaintiff's performance, conduct, and separation.

7. Orders requiring Defendant to implement corrective measures to prevent future harassment, retaliation, and procedural misconduct.

8. Orders requiring Defendant to provide training to management officials involved in Plaintiff's case.

9. Any additional equitable relief the Court deems just and proper.

## F. Protection for Witnesses

Plaintiff requests Court-ordered protection from retaliation for the following individuals who provided truthful accounts of the events described herein:

- **Michelle Klug**
- **Michele Malone**
- **Laura Brouach**
- **Dustin Biermann**
- **Dustin Bremerman**

These individuals witnessed key events, provided contemporaneous documentation, or intervened to protect Plaintiff. Plaintiff requests injunctive relief prohibiting Defendant, its agents, or any affiliated personnel from retaliating against these witnesses in any form.

## G. Protection of Plaintiff's Public-Speech Rights

Plaintiff requests declaratory and injunctive relief affirming her right to:

1. **Speak publicly** about her experiences, including on social media, interviews, podcasts, and public forums.

2. **Publish books, memoirs, or educational materials** based on her lived experience, including retaining full book rights and intellectual property rights.

3. **Develop and commercialize a Microsoft-aligned vertical,** including AI-based legal navigation tools, without interference or retaliation.

4. **Discuss all events described in this complaint** without fear of reprisal, retaliation, or adverse action by Defendant or its agents.

5. **Engage in public advocacy, commentary, or educational work** related to workplace bullying, federal employment, disability rights, or government accountability.

Plaintiff requests an order prohibiting Defendant from taking any adverse action, directly or indirectly, in response to Plaintiff's lawful public speech, creative works, or business development activities.

## H. Attorney's Fees and Costs

Plaintiff requests:

- litigation costs,

- expert fees,

- reimbursement for document production,

- and any statutory fees available under Title VII and the Rehabilitation Act.

## I. Any Other Relief the Court Deems Just and Proper

Plaintiff requests all additional relief, legal or equitable, that the Court determines is appropriate based on the evidence, including remedies equivalent to punitive damages where permitted under federal law.

## SECTION X — SIGNATURE BLOCK

**Respectfully submitted,**

**/s/ Della C. Bond Della C. Bond**

Plaintiff, Pro Se

North Las Vegas, Nevada

Email: ms.dellabond@gmail.com

Phone: **(414) 844-4800 x43262**

Date: **Della C. Bond**

Digitally signed by Della C. Bond
Date: 2026.07.09
12:36:06 -07'00'